**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHRISTOPHER TULLY,<br><br>                              *Plaintiff,*<br><br>            v.<br><br>OFFICE OF THE COMMISSIONER OF BASEBALL<br>d/b/a MAJOR LEAGUE BASEBALL; MAJOR<br>LEAGUE BASEBALL PENSION COMMITTEE;<br>MAJOR LEAGUE BASEBALL SUPPLEMENTAL<br>PENSION PLAN FOR OFFICE EMPLOYEES,<br><br>                              *Defendants.* | **COMPLAINT**<br><br>Case No.: |

Christopher Tully ("Tully" or "Plaintiff"), by and through his attorneys, as and for his Complaint, alleges with knowledge as to himself and otherwise upon information and belief as follows:

## NATURE OF CASE

1.      Tully brings this action to recover the full amount of the retirement benefit he earned over the course of a 30-year career at Major League Baseball ("MLB").

2.      This retirement benefit was unambiguously set forth in a contract Tully entered into with MLB in 1998.

3.      While Tully received annual distributions of his benefit for years 1999 through 2003, the retirement benefit contract was amended through a formal amendment in 2004 to cease annual distributions, to thereafter defer the distribution of accrued benefits, and to introduce a substantial risk of forfeiture of benefits if an employee subject to the plan were to voluntarily leave before attaining age 60 with 20 years of service, or age 65.  The 2004 amendment of the Major League Baseball Supplemental Pension Plan for Office Employees (the "SUPP") had its desired effect and induced Tully to dedicate the last 20 years of his career to MLB.

4.      Upon Tully's retirement from MLB at the end of 2022, MLB denied him the full sum of his hard-earned retirement benefit and has taken a position contrary to the contract and law, compelling Tully to commence this proceeding.

5.      Tully brings this action pursuant to the enforcement provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), to recover benefits due to him under the terms of the SUPP and to obtain appropriate equitable relief.

6.      Tully initially joined MLB as Associate Counsel in February 1992.  He later served as Vice President of Business Affairs; Senior Vice President of Broadcasting; and, most recently, as Executive Vice President of Global Media, before his retirement in December 2022.

7.      Tully played a key role in securing billions of dollars in local, national, and international rights fees for MLB and in connection with the launch of MLB Network.

8.      Upon joining MLB, Tully became a Participant in MLB's Office Employees Plan (the "OEP"),[1] a tax-qualified defined benefit pension plan for office employees of MLB and its affiliates.

9.      In November 1998, Tully joined the Major League Baseball Supplemental Pension Plan for Non-Uniformed Personnel which became the SUPP.[2]

10.     The SUPP, a nonqualified deferred compensation plan under Section 409A of the Internal Revenue Code (the "IRC"), was a lucrative benefit created to provide Key Employees of

---

[1] When Tully retired, the operative version of the OEP was the Office Employees Plan, Amended and Restated as of January 1, 2013, as amended.  Unless otherwise stated, references herein to the OEP refer to this document.

[2] At the time of Tully's retirement, the operative version was the Major League Baseball Supplemental Pension Plan for Office Employees, Amended and Restated as of January 1, 2014, together with the First Amendment to the Major League Baseball Supplemental Pension Plan for Office Employees, effective April 1, 2017.  Unless otherwise stated, references herein to the SUPP refer to these documents.

MLB and its affiliates with retirement income not otherwise payable under the OEP due to limits imposed by various provisions of the IRC and was used to induce Key Employees to make MLB their long-term professional home.  (SUPP at Introduction and §§ 5.7 and 5.10.)  The SUPP is "an unfunded top hat plan for a select group of management and highly compensated employees and accordingly, is exempt from the requirements of Parts 2, 3 and 4 of Title I of ERISA".  (SUPP at Introduction).

11.     When inviting him to participate, MLB gave Tully a copy of the SUPP, a Memorandum and Acknowledgement of Receipt that included a statement summarizing the scope and amount of Tully's projected SUPP benefit (the "Designation Notice"), and a form permitting Tully to elect to receive his benefit in the form of annual distributions rather than as a lump-sum upon retirement (the "Qualified Notice").

12.     The Designation Notice stated that Tully was entitled to "Full" "Pay Restoration for Office Plan Benefit."

13.     The "Office Plan Benefit" is the benefit under the OEP.

14.     As a qualified retirement plan, the OEP is subject to provisions of the IRC which limits, among other things, the total compensation that may be taken into account when calculating plan benefits.

15.     The Designation Notice explained that the SUPP is intended to provide Participants with that portion of the benefit that would be payable to them under the OEP but for the limitations imposed by the IRC.  Specifically, the Designation Notice advised:

> The Plan [OEP] is subject to Internal Revenue Service rules that limit the benefit you can earn.  In particular, the Plan is not permitted to take into account compensation you earn over $160,000 per year.  In general, the SUPP makes up for that limitation.

16.     The SUPP makes Participants "whole." In other words, it facilitates the payment of the full retirement benefit a Participant could have received under the OEP if the OEP were not subject to the IRC's compensation limitations imposed on qualified plans.

17.     The SUPP states that it "only benefits employees that also participate in the Retirement Plan [OEP]."  (SUPP at Introduction.)

18.     Tully signed the Designation Notice, completed the Qualified Notice, and returned those papers to MLB on November 30, 1998.

19.     MLB subsequently mailed Tully a copy of his signed Designation Notice along with a copy of the SUPP and his signed election to receive annual distributions.

20.     During his 30-year career at MLB, Tully received an annual discretionary bonus virtually every year.

21.     These regular annual bonuses were a core component of Tully's total compensation.  While his base pay increased over the course of his career, so too did his annual bonuses.  In the final five plan years of his participation in the SUPP, his annual bonuses averaged over 45% of his base salary for the year the bonus was earned.

22.     Tully retired from MLB on December 31, 2022, after receiving his final salary payment and an annual bonus.

23.     In connection with Tully's retirement, MLB calculated Tully's lump-sum as the sixth and final distribution of his SUPP benefit.

24.     On January 11, 2023, Rich Hunt, MLB's Senior Director of Retirement and Financial Services, sent Tully an email attaching a Statement of SUPP Accrued Benefits with Termination on December 31, 2022.  This was the first statement Tully received in connection

with an actual payment under the SUPP since the statement MLB had sent him in connection with the distribution it paid Tully for the 2002 plan year.

25.    The 2023 statement included an illustration of MLB's calculation of Tully's SUPP benefit.

26.    MLB's calculation purported to reflect Tully's Earnings over the 60-month period from January 1, 2018 to December 31, 2022, but improperly excluded Tully's bonuses from that period.

27.    Because Tully had earned $3,250,000 in bonuses during those years, the exclusion materially reduced the calculation of his SUPP benefit.

28.    On January 17, 2023, Tully received a wire transfer from MLB reflecting payment of the Supplemental Benefit, as calculated by MLB (less applicable withholding taxes).

29.    Tully repeatedly objected to MLB's calculation, verbally and in writing, and sent Hunt a copy of the Designation Notice—which stated Tully was entitled to "Full" "Pay Restoration for Office Plan Benefit"—when Hunt struggled to locate it within MLB's files.  Hunt informed Tully he would investigate Tully's position and acknowledged that Tully's receipt of the wire transfer would not preclude him from receiving any additional amount to which he might be entitled.

30.    On January 24, 2023, Hunt stated by email that MLB and its outside counsel were reviewing "several hundred pages of historical SUPP info from the Records [Department], including calculations, correspondence, etc." to find some basis for the exclusion of Tully's annual bonuses.

31.    As of February 6, 2023, MLB still had not identified for Tully any provision of the SUPP which permitted the exclusion of his bonuses from the calculation of his benefit under the

SUPP and, accordingly, Tully timely submitted a written claim to MLB Pension Committee seeking the balance of his benefit (the "Administrative Claim").

32.     On May 4, 2023, in a decision by Hunt (apparently acting as an agent of the committee), the Pension Committee rejected Tully's Administrative Claim (the "Initial Determination").

33.     On June 30, 2023, Tully timely submitted an application to the Pension Committee for review of the Initial Determination (as supplemented and amended, the "Administrative Appeal").

34.     On August 28, 2023, the Pension Committee denied the Administrative Appeal (the "Appeal Decision").    The alleged basis for excluding Tully's bonuses for the purpose of determining the SUPP has varied in MLB's original response, to the Initial Determination, and to the Appeal Decision.

35.     The SUPP clearly mandates that the bonuses MLB paid over the final five years of Tully's employment (2018 to 2022) be taken into account in determining the amount of his benefit under the SUPP.

36.     The SUPP's clear mandate that bonuses be taken into account for the purpose of calculating OEP and SUPP benefits is shown in at least three ways.    First, the OEP's definition of "Earnings" starts with counting all of the "Form W-2 cash earnings," which necessarily includes bonuses.    Second, the definition expressly states that it includes bonuses.    Third, the definition expressly excludes a category of payments from "Earnings," which clearly shows that MLB knew that, absent an amendment to the OEP and/or SUPP to expressly exclude a "Form W-2 cash earnings" category wholesale, every category of "Form W-2 cash earnings" would continue to be included.    In 2009, the OEP was amended to expressly exclude the category of severance payments

from the "Earnings" definition, with such amendment impacting the calculation of benefits for purposes of both the OEP and SUPP plans.

37.    In excluding bonus payments from such determination, MLB has wrongfully and arbitrarily withheld a significant percentage of the SUPP benefit that Tully earned over his career at MLB.

38.    In summary, MLB's determinations at any stage of its review do not survive either *de novo* or arbitrary and capricious review.  The SUPP unambiguously mandates the inclusion of bonuses in the calculation of a Participant's benefit under the SUPP.  The SUPP also sets out strict amendment procedures, and MLB does not allege that it amended the SUPP to exclude bonuses from the calculations.  The SUPP also sets out strict written designation and acknowledgement procedures for any limit to be imposed on the amount of compensation to be taken into account for determining the benefit and the effective timing of the same.  The Pension Committee's interpretation of the SUPP directly contradicts the express terms of the SUPP and Tully's Designation Notice and violates general rules of contract interpretation.

39.    Therefore, Tully is entitled to payment of his full benefit under the SUPP, with interest, costs, and attorney's fees, pursuant to SUPP § 5.6 and ERISA.

## JURISDICTION AND VENUE

40.    This Court has subject matter jurisdiction over the action arising under ERISA pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).  This Court also has subject matter jurisdiction over the ERISA claims pursuant to 28 U.S.C. § 1332, because the parties are of diverse citizenship and the matter in controversy exceeds $75,000, exclusive of interest and costs.

41.    Venue in the Southern District of New York is proper pursuant to 28 U.S.C. § 1391 and ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the plan is administered in this district, some or all of the breaches took place in this district, and the defendants reside or may be found in this district.

42.    The SUPP provides that the laws of the State of New York shall govern to the extent that such laws are not preempted by federal laws.  (SUPP § 5.7(a).)

## PARTIES

43.    Plaintiff, Christopher Tully, is a citizen of the State of Florida who was employed by MLB and its affiliates from February 24, 1992 through December 31, 2022. He is a "Participant" in the SUPP within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7) and as per SUPP § 1.15.

44.    Defendant Office of the Commissioner of Baseball, doing business as Major League Baseball, is an unincorporated association comprised of associated baseball clubs with its principal place of business at 1271 Sixth Avenue, New York, NY 10020.  MLB is an "employer" under the SUPP within the meaning of ERISA § 3(5), 29 U.S.C. § 1002(5).  (SUPP § 1.20.)[3] MLB is also a "Supplemental Plan Employer" as defined under SUPP § 1.20.

45.    Defendant Major League Baseball Pension Committee ("Pension Committee") administers the SUPP and thus is an "administrator" of the SUPP within the meaning of ERISA § 3(16), 29 U.S.C. § 1002(16).  (*See* SUPP § 1.8 (stating Pension Committee administers the SUPP).)

---

[3] From April 1, 2017 to December 31, 2019, Tully was employed by MLB Advanced Media L.P. ("BAM"), a limited partnership of the club owners of Major League Baseball.  BAM shares its principal place of business with MLB.  It is an "employer" under the SUPP.  (First Amendment to the Major League Baseball Supplemental Pension Plan for Office Employees, effective April 1, 2017.)  Although Tully's Supplemental Benefit continued to accrue while he worked for BAM, MLB is solely responsible for the payment of Tully's Supplemental Benefit because it is the plan employer who designated Tully for participation in the SUPP.  (SUPP § 5.2.)

46.     Defendant Major League Baseball Supplemental Pension Plan For Office Employees was established by Major League Baseball to provide a select group of Key Employees with additional retirement benefits not otherwise payable under Major League Baseball's qualified pension plan.  (SUPP at Introduction).  The SUPP is an "employee benefit plan" within the meaning of ERISA § 3(3), 29 U.S.C. § 1002(3).

## FACTUAL BACKGROUND

### *Tully Joins MLB and Enrolls in MLB's Retirement Plans*

47.     When Tully joined MLB as Associate Counsel in February 1992 he became a Participant in the OEP.

48.     MLB invited Tully to join the SUPP in November 1998. Tully received a copy of the SUPP, the Designation Notice, which stated Tully was entitled to "Full" "Pay Restoration for Office Plan Benefit," and the Qualified Notice form permitting Tully to elect to receive his benefit in the form of annual distributions rather than as a lump-sum upon retirement.

### *Background and Key Terms of the OEP and SUPP*

49.     The SUPP is defined as "this Major League Baseball Supplemental Pension Plan for Office Employees"; it includes no documents or materials other than those expressly referenced therein.  (SUPP § 1.19.)  The SUPP provides that the plan can only be amended "by an instrument in writing executed by the Commissioner and delivered to all participating Supplemental Plan Employers and to the Committee" and that "no such amendment shall adversely affect any benefits accrued by any Participant prior to the effective date of such amendment." (SUPP § 5.1(a)).

50.     The SUPP provides, in pertinent part, a simple formula for calculating a Participant's "Supplemental Benefit":

> the lump sum benefit that is Actuarially Equivalent to . . . the excess, if any of (i) the Gross Benefit over (ii) the Benefit Offset . . . .

(SUPP § 1.18.)

51.    Consistent with the SUPP's purpose to compensate a Participant for the IRC's limits on the benefit payable under the OEP, the "Gross Benefit" is the amount the SUPP Participant is entitled to receive under the OEP, without regard to the limitations imposed by Sections 401(a)(17) and 415 of the IRC, but is "subject to such aggregate dollar limitation as may be imposed by the Supplemental Plan Employer in connection with the Participant's participation in the Supplemental Plan."  (SUPP § 1.12.)

52.    The "Benefit Offset" is the payable benefit to which the Participant is entitled under the OEP.  (SUPP § 1.5.)

53.    The OEP provides for a retirement benefit calculated using a Participant's average earnings for his or her highest-earning five consecutive years over the final ten years of qualified service.  (OEP Art. V.)

54.    The OEP expressly includes bonuses in its definition of "Earnings":

> the total Form W-2 cash earnings … including overtime, *bonuses*, incentive compensation, commissions, premiums, and any other form of additional compensation….

OEP at 4 (defining "Earnings") (emphasis added).

55.    Section 2.1 of the SUPP provides "Each Supplemental Plan Employer shall designate those of its Key Employees eligible to participate hereunder by written notice to the Committee and to such Key Employee. In connection with such designation, the Supplemental Plan Employer shall specify in such notice whether any limit shall be imposed on the amount of compensation taken into account for purposes of determining such Key Employee's Supplemental Benefit."  (SUPP § 2.1.)

56.     A "'Key Employee' means an employee of a Supplemental Plan Employer whose benefit under the Retirement Plan of such Supplemental Plan Employer would be limited or is expected to be limited by reason of Sections 401(a)(l7) or 415 of the Code." (SUPP § 1.13.)

57.     A "'Participant' means a Key Employee of a Supplemental Plan Employer who has been designated as a Participant by the Supplemental Plan Employer as provided in Section 2.1 hereof." (SUPP § 1.15.)

58.     In other words, the SUPP only allows a limitation to be imposed if it is specified in a designation to a "Key Employee," not a "Participant," prior to participation.

59.     Tully was never notified of any limitation on his Supplemental Benefit prior to becoming a Participant in the plan.

60.     While the SUPP provides that "[t]he Committee shall be entitled to reduce the amounts payable hereunder to avoid the duplication of benefits otherwise payable through [the SUPP], as a result of adjustments under Section 401(a)(17) of the Code or otherwise," the SUPP does not grant any continuing authority to a Supplemental Plan Employer to impose any limitation on the benefit—for any reason—once a designated employee's participation in the SUPP has commenced. (SUPP § 5.9.)

61.     The SUPP repeatedly emphasizes it must be interpreted and applied consistent with its status as a nonqualified deferred compensation plan under IRC Section 409A.

62.     "The [SUPP] is intended to qualify as a plan maintained primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees as referred to in [ERISA § 201(2)], and its terms shall be interpreted accordingly." (SUPP § 5.7)

63.    The SUPP requires that "all provisions of the SUPP . . . be construed and interpreted to comply with [Internal Revenue] Code Section 409A . . . ."  (SUPP § 5.10.)

64.    Any provision that fails to comply with IRC Section 409A or its implementing regulations "shall be held null and void."  (*Id.*)

65.    The SUPP requires MLB "to pay to [Tully] all legal fees and expenses incurred by [Tully] in seeking to enforce any right or benefit provided to [Tully] under the Supplemental Plan, as and when such expenses become due."  (SUPP § 5.6.)

66.    On November 30, 1998, MLB presented Tully with the Designation Notice that advised him of his eligibility to participate in the SUPP, set forth a summary of the terms governing his participation in the SUPP, and confirmed he was entitled to "Full" "Pay Restoration for Office Plan Benefit."

67.    On the same day, Tully signed and returned the Designation Notice based upon MLB's summary and confirmation of the scope of his benefit.

68.    Pursuant to the terms of his Qualified Notice, Tully's Supplemental Benefit vested on November 1, 1999.  (SUPP dated June 10, 1997 § 1.33.)  While MLB amended the SUPP in 2004 to eliminate elective vesting, a subsequent amendment in 2014 stated "A Participant shall be immediately vested in his Supplemental Benefit."  (SUPP § 2.3.)

***MLB Pays Five Annual Distributions Consistent with the Express Terms of the SUPP***

69.    For the first five years in which Tully participated in the SUPP, the plan was structured so that Participants could elect to receive annual distributions of benefits accrued in each plan year.

70.     Consistent with that structure, Tully elected to receive, and did receive, annual SUPP distributions for plan years 1999, 2000, 2001, 2002, and 2003 (the "Annual Distribution Plan Years").

71.     The annual distribution for each of the Annual Distribution Plan Years was paid in January of the following year, except the distribution for plan year 1999 which was paid in November 1999.

72.     Tully received an annual bonus during each of the Annual Distribution Plan Years except 2002.

73.     Each SUPP distribution Tully received for the Annual Distribution Plan Years took the applicable bonuses into account.

74.     For the first four Annual Distribution Plan Years (1999, 2000, 2001, 2002), MLB provided Tully with a memo and attached a statement summarizing the calculation of the SUPP distribution for that plan year.

75.     Each of these memos confirmed Tully's bonuses were included in the calculation of his SUPP benefit.  Specifically, each memo stated that the distribution payment reflected "the difference between what will be paid to you upon termination or retirement from the qualified plan, and the total amount due to you if *all your compensation was pensionable.*" (emphasis added.)

76.     Likewise, the statement attached to each memo confirmed the inclusion of Tully's bonuses in the calculation of his SUPP benefit.  Each statement provided a line item of yearly Earnings for the rolling five-year period utilized in the calculation of the distribution for that plan year.  These line items included Tully's bonus as part of his Earnings.

77.     Upon information and belief, when MLB paid Tully his annual distribution for plan year 2003, it did not provide him with a memo or statement calculating his benefit.

78.     Nevertheless, upon information and belief, MLB applied the same methodology to calculate Tully's distribution for plan year 2003 as it had for all other Annual Distribution Plan Years, meaning that it included all bonuses Tully received during the relevant five-year period when calculating his SUPP benefit for plan year 2003.

### MLB Terminates Annual Distributions

79.     Effective January 1, 2004, MLB amended the SUPP in three key respects, as explained in a memorandum to all SUPP Participants from MLB's then-Executive Vice President of Labor and Human Resources, Robert D. Manfred, Jr. ("2004 Manfred Memo").

80.     First, the amendment shifted future benefit accruals under the SUPP to the OEP for most SUPP Participants.

81.     However, a "small number" of SUPP Participants, including Tully, would "accrue additional benefits under the SUPP to the extent that not *all* of their benefits could be shifted to the Office Plan." (2004 Manfred Memo at 1) (emphasis added).

82.     Second, the amendment eliminated Participants' option to elect to receive annual distributions from the SUPP and instead mandated the deferral of the SUPP benefit until a specified distribution date, such as the attainment of retirement age, at which time the entire SUPP benefit would be paid as a lump-sum.

83.     Accordingly, as of the 2004 plan year, Tully would no longer receive annual distributions of his Supplemental Benefit. Instead, his entire benefit under the SUPP would be deferred until retirement.

84.     Third, the amendment established a bright-line rule that any Participant who voluntarily left MLB prior to retirement would forfeit his or her entire accrued SUPP benefit.

85.     These changes to the SUPP purportedly secured certain tax-deferral advantages for Participants while creating an ever-growing financial incentive for Participants to remain with MLB until their retirement.

86.     The 2004 Manfred Memo emphasized to all SUPP Participants that such changes to the SUPP would "result in a more favorable plan for you."

87.     The rapidly escalating accrual of benefits based on Tully's increases in compensation and his approach to retirement age served as material inducements for Tully to devote the entirety of his career to MLB.  Indeed, this benefit induced Tully to remain in MLB's employ for nearly 20 more years while he awaited his pay out upon retirement.

88.     Tully retired at the end of 2022.

***Tully Relies on MLB's Inclusion of Annual Bonuses in the Calculation of His Supplemental Benefit***

89.     Participation in the SUPP represented a substantial benefit to Tully.  As a highly compensated employee, his compensation exceeded the maximum pensionable compensation under the IRC in every year of Tully's participation in the SUPP.

90.     The inclusion of bonuses in the calculation of Supplemental Benefits was a material term of the SUPP.

91.     Section 2.1, which mandates that limitations must be specified prior to a Key Employee's commencement of participation—and cannot be subsequently changed absent an amendment pursuant to Section 5.1—was a material term of the SUPP.  (*See* SUPP § 2.1 ("In connection with such designation, the Supplemental Plan Employer shall specify in such notice whether any limit shall be imposed on the amount of compensation taken into account for purposes of determining such Key Employee's Supplemental Benefit.").)  (*See also id.* at § 2.2.)

92.     MLB routinely awarded annual bonuses to its Key Employees.  These annual bonuses were distinct from *one-time* bonus payments, such as signing, referral, retention, transaction, and spot bonuses as well as the one-time bonus payment Tully received in connection with his role in creating and launching MLB Network.

93.     During his 30-year career at MLB, Tully received an annual bonus virtually every year.

94.     Tully's regular annual bonuses were a core component of Tully's total compensation.

95.     If Tully had reason to believe that, notwithstanding the clear terms of the SUPP, his bonuses could be excluded from the calculation of his Supplemental Benefit without an amendment to the plan, he would have sought to negotiate deriving a greater portion of his annual compensation from his base pay.

### *MLB Breaches Its Obligations When Paying the Sixth and Final Payment Under the SUPP upon Tully's Retirement*

96.     Tully retired from MLB on December 31, 2022, after receiving his final salary payment and an annual bonus.

97.     In connection with Tully's retirement, MLB calculated Tully's lump-sum as the sixth and final distribution of his Supplemental Benefit.

98.     On January 11, 2023, Rich Hunt sent Tully an email attaching a Statement of SUPP Accrued Benefits with Termination on December 31, 2022.  This was the first statement Tully received in connection with an actual payment under the SUPP since the statement MLB had sent him in connection with the distribution it paid Tully for the 2002 plan year.

99.     The 2023 statement included an illustration of MLB's calculation of Tully's SUPP benefit.

100.    That calculation purported to reflect Tully's Earnings over the 60-month period from January 1, 2018 to December 31, 2022, but improperly excluded Tully's bonuses from that period.

101.    On January 17, 2023, Tully received a wire transfer from MLB reflecting payment of the Supplemental Benefit, as calculated by MLB (less applicable withholding taxes), which payment did not reflect the inclusion of his bonuses.

102.    Tully repeatedly objected to MLB's calculation, verbally and in writing, and sent Hunt a copy of the Designation Notice, which Hunt could not find.  Hunt promised to investigate Tully's position and assured Tully that receipt of the wire transfer would not preclude him from receiving any additional amount to which he might be entitled.

### *MLB Grasps for a Justification of Its Breach*

103.    As of January 24, 2023, MLB still had not identified for Tully any provision of the SUPP which permitted the exclusion of his bonuses from the calculation of his Supplemental Benefit.

104.    Instead, on January 24, 2023, Hunt stated by email that MLB and its outside counsel were reviewing "several hundred pages of historical SUPP info from the Records [Department], including calculations, correspondence, etc." to find some basis for the exclusion of Tully's annual bonuses.

105.    On January 30, 2023, Hunt emailed Tully the document MLB would seize upon in an effort to justify its breach—a memorandum dated January 6, 2003 from Jonathan Mariner (MLB's then-CFO) to Tully concerning "SERP Payments and Calculations," which included an attachment showing a calculation of the SUPP distribution for the 2002 plan year that was scheduled to be paid on January 7, 2003 (collectively, the "2003 Mariner Memo").

106.    Hunt told Tully that MLB "searched the files and found [the 2003 Mariner Memo] from 2002, when the Plan ceased payment of annual distributions and ceased including bonuses in the benefit calculation."

107.    There is no logical connection between the 2003 Mariner Memo and the forthcoming cessation of annual distributions, which occurred in 2004.

108.    The 2003 Mariner Memo makes no mention of the change, and neither the 2004 amendment nor the 2004 Manfred Memo make any reference to the exclusion of bonuses from the calculation of SUPP benefits.

109.    As support for his assertion that the 2003 Mariner Memo reflected a decision by MLB in 2002 to "cease[] including bonuses in the benefit calculation," Hunt identified a single sentence in the memo which stated "One-time bonus payments are typically not included." The bonuses at issue here are not one-time bonus payments but rather, annual bonuses.

110.     MLB's reliance on one sentence from a 20-year-old memo to justify the exclusion of millions of dollars of bonuses from Tully's earnings under the plan is unsupportable and contrary to both the clear mandate of the SUPP and governing law.

111.    While the vague statement that "[o]ne-time bonuses are typically not included" might have had some applicability to certain SUPP Participants, it was clearly not applicable to Tully, who was entitled to a "Full" "Pay Restoration for Office Plan Benefit" and whose annual Supplemental Benefit distributions had consistently been based upon _all_ of his Earnings (which, by definition, included his annual bonuses) during the applicable period.

112.    Any reasonable person would interpret the reference to "one-time bonus payments" to refer to unique, one-time payments like those paid as signing, referral, or project-specific spot bonuses—not regular, annual bonuses like those that MLB routinely paid to Tully.

113.    Tully's SUPP distribution for plan year 2002, summarized in the attachment to the 2003 Mariner Memo, reflected Tully's five-year average Earnings, which, per the definition in the OEP, included bonuses.

114.    Moreover, the payment calculation attached to the 2003 Mariner Memo did not in any way suggest that Tully's bonuses had been excluded or would be excluded in the future.

115.    To the contrary, it listed Tully's "W-2 Earnings" from 1997 to 2002 and included in each year's Earnings the bonus, if any, he received in that year.

116.    Notably, the 2003 Mariner Memo warned Tully the Supplemental Benefit calculation was "complicated" and advised that the six years of W-2 earnings listed in the statement did not match his W-2s for those years.

117.    The 2003 Mariner Memo also highlighted that MLB relied upon Tully's _total compensation_ when it performed the six-part calculation necessary to determine his SUPP benefit.

118.    The memo explained that "Part D" of the calculation reflected the difference between Tully's benefit under the OEP and the SUPP, stating, "This payment is the difference between what will be paid to you upon termination or retirement from the qualified plan [OEP] and the total amount due to you if _all your compensation_ was pensionable."  (emphasis added.)

119.    That sentence was fully consistent with the purpose and terms of the SUPP and with Tully's Designation Notice, which provided that his SUPP benefit was designed to be a "Full" "Pay Restoration for Office Plan Benefit."  Accordingly, the 2003 Mariner Memo reinforced that—consistent with all prior annual SUPP distributions—Tully's entire compensation, inclusive of his bonuses, was included in the SUPP benefit calculation.

120.    In summary, the 2003 Mariner Memo was an extraneous document and could not override the unambiguous terms of the SUPP.  In any event, the 2003 Mariner Memo actually

reinforced that the final, lump-sum payment of Tully's Supplemental Benefit should have been calculated based on <u>all</u> of his Earnings, as defined in the OEP to include his annual bonuses, for the applicable period.

### Tully's Efforts to Obtain an Administrative Remedy are Denied

121.    On February 6, 2023, Tully timely submitted the Administrative Claim to the Pension Committee.

122.    In its May 4, 2023 Initial Determination, the Pension Committee rejected Tully's Administrative Claim.

123.    After receiving the Initial Determination, Tully served requests for the production of documents relevant to his claim and to the Initial Determination.  The Pension Committee, again acting through Hunt, failed to respond fully to those requests, claiming that numerous categories of documents necessary to confirm the details of Tully's own benefits and to substantiate the Pension Committee's own interpretation of the SUPP were not relevant.  For example, the Pension Committee refused to produce:

      a.      The voluminous records that Hunt had previously told Tully in writing were being reviewed by Hunt and MLB's lawyers in connection with MLB's response to Tully's initial objection to the calculation of his final Supplemental Benefit, claiming that those documents had been reviewed (by Hunt) before Tully submitted his Administrative Claim and were not considered in connection with the Initial Determination (written by Hunt). (7/14/23 MLB Responses to Requests for Documents ("<u>7/14/23 MLB Responses</u>") at Nos. 4 and 5.)

      b.      Records concerning MLB's purported decision in 2002 to exclude all bonuses paid after 2001 from Tully's Supplemental Benefit calculation. (7/14/23 MLB Responses at Nos. 13-14, and 18.)

      c.      Records concerning whether MLB also excluded bonuses from the Supplemental Benefit calculation of other plan Participants, including whether such exclusion was applied to other Participants entitled to a full restoration of their office plan benefit.  (MLB instead relied upon Hunt's personal "understanding" that "no bonuses have been included when

calculating benefits under the SUPP since 2002 for any participant.") (7/14/23 MLB Responses at No. 17.)

     d.     Records concerning designation notices and limitations on benefits granted to other SUPP Participants.  (7/14/23 MLB Responses at Nos. 10–12, and 37–38.)

     e.     Records giving rise to the 2003 Mariner Memo and 2004 Mariner Memo. (7/14/23 MLB Responses at Nos. 26-27.)

     f.     Records concerning Tully's annual benefit statement for plan year 2003 (if they exist).  (7/14/23 MLB Responses at No. 29.)

     g.     Records concerning the amount and date of payment of each of Tully's annual bonuses and the amount of Tully's annual pensionable Earnings during Tully's employment.  (7/14/23 MLB Responses at No. 32.)

124.    On June 30, 2023, Tully timely submitted the Administrative Appeal to the Pension Committee for review of the Initial Determination.

125.    On August 28, 2023, the Pension Committee issued the Appeal Decision denying the Administrative Appeal.

126.    The Appeal Decision, like the Initial Determination, is premised upon documents which MLB did not reference when it initially denied Tully his full Supplemental Benefit.

127.    The Appeal Decision concluded that:

     a.     Section 1.12 of the SUPP gives plan employers "broad discretionary authority to limit the _type_ of compensation taken into account for purposes of calculating a Plan benefit, such as by excluding bonuses." (emphasis added.)

     b.     MLB could impose such a limitation at any time.

     c.     This unqualified discretion is unaffected by any methodology MLB had utilized to calculate Earnings in the past.

     d.     This unqualified discretion is also unaffected by any designation notice given to a SUPP Participant, including Tully's 1998 Designation Notice stating that he was entitled to "Full" "Pay Restoration for Office Plan Benefit."

     e.     MLB had apparently exercised this discretion to exclude _all bonuses_ received by _all Participants_ after 2001.

f.     MLB had no legal obligation to notify Tully of this change to the calculation of his benefit.

g.     Even if a duty to notify did exist, MLB provided sufficient notice through the 2003 Mariner Memo, the 2004 Manfred Memo, and certain subsequent communications.

h.     Consistent with applicable regulations, such as Treasury Regulation § 1.409A-1(c)(3)(i), MLB is permitted to include material terms and conditions in documents that are separate and apart from the SUPP document and that MLB validly documented the additional limitations that it imposed consistent with its authority under Section 1.12 of the SUPP through the use of these memoranda, rather than a formal amendment to the SUPP.

***Tully's Claim is Based on the SUPP's Clear Mandate that his Bonuses be Taken into Account and De Novo Review is Appropriate for the Interpretation of this Unambiguous Language***

128.    The SUPP mandates that Tully's Gross Benefit and Supplemental Benefit be determined solely pursuant to the SUPP and his Designation Notice.  (*See* SUPP Introduction and § 1.19; *see also* §§ 1.12 ("Gross Benefit"), 1.18 ("Supplemental Benefit"), 2.1 ("Designation of Participants").)

129.    Since the SUPP expressly provides that it can only be amended in accordance with the terms of Section 5.1(a), the only documents that set forth the terms and conditions of the SUPP with respect to any Participant are the SUPP document itself, such Participant's designation notice, and any written amendment executed by the Commissioner pursuant to Section 5.1(a).

130.    The terms of the SUPP are clear and unambiguous; no extraneous documents are relevant to this matter and none should be relied upon in interpreting the SUPP.

131.    The SUPP expressly mandates the inclusion of bonuses.[4]

---

[4] "'Earnings' means the total Form W-2 cash earnings of a Participant paid by an Employer, before any reduction therefrom under any plan of any Employer meeting the requirements of Code section 401(k) or 125, including overtime, bonuses, incentive compensation, commissions, premiums and any other form of additional compensation, as shown by the records of the Employer. However, if a Participant receives some or all of his pay, or some or all of any of his additional compensation

132.    There is no provision of the SUPP that allows for a Supplemental Plan Employer to exclude bonuses from the calculation.

133.    While the SUPP was amended, or amended and restated, numerous times during Tully's participation, no amendment to the SUPP ever authorized the Supplemental Plan Employer to exclude bonuses from the calculation of a Participant's Gross Benefit or Supplemental Benefit.

134.    Once a Key Employee has commenced his or her participation in the SUPP, the SUPP does not allow for a Supplemental Plan Employer to thereafter impose "any limit on the amount of compensation taken into account for purposes of determining [the Supplemental Benefit]."

135.    Further, the SUPP does not allow for a Supplemental Plan Employer to supersede a Participant's designation notice, whether by any subsequent communication from such employer or otherwise.

136.    Accordingly, MLB's purported right, as Tully's Supplemental Plan Employer, to impose an "aggregate dollar limitation" on how much of his compensation is taken into account "in connection with [his] participation in the [SUPP]," to the extent it was enforceable, ended once MLB designated Tully as eligible for participation in the SUPP and presented him with the Designation Notice pursuant to SUPP § 2.1 informing him that his Supplemental Benefit would provide *full restoration of his office plan benefit*.

---

which is included in Earnings pursuant to this definition, in a currency other than United States dollars, then the foreign currency shall be translated into United States dollars for purposes of the Plan as of the time that such base pay or additional compensation is paid to the Participant at the exchange rate then used by the Employer for translating compensatory amounts payable in such currency into United States dollars for federal personal income tax reporting purposes. Notwithstanding the foregoing, Earnings shall not include any severance payments or compensation paid in lieu of severance from employment."  (*See* OEP at 4; *see also* SUPP §§ 1.12 and 1.18.)

137.    Indeed, each SUPP distribution Tully received for the Annual Distribution Plan Years took the applicable bonuses into account. The memos provided to Tully from 1999 to 2002 confirmed that bonuses were to be included in his SUPP benefit.  Specifically, each memo stated that the distribution payment reflected "the difference between what will be paid to you upon termination or retirement from the qualified plan, and the total amount due to you if *all your compensation was pensionable.*" (emphasis added.)

138.    Likewise, the  statement attached to each such memo provided a line item of yearly Earnings for the rolling five-year period utilized in the calculation of the distribution for that plan year.  These line items included Tully's bonus as part of his Earnings in each year he received a bonus.

139.    In summary, the clear and unambiguous terms of the SUPP and the Designation Notice mandate that the bonuses MLB paid to Tully over the final five years of Tully's employment (2018 to 2022) be taken into account in determining his Gross Benefit and, in turn, his Supplemental Benefit.  Further, the inclusion of Tully's bonuses in the calculation of the final distribution of his Supplemental Benefit would be entirely consistent with the inclusion of his bonuses in all of the prior SUPP distributions he received.

140.    The Pension Committee's interpretation of the SUPP as allowing for MLB to exclude Tully's bonuses from the calculation of his Gross Benefit and Supplemental Benefit is in direct conflict with the clear and unambiguous language of the SUPP, cannot survive *de novo* review, and is also arbitrary and capricious.

### *No Evidence Has Been Presented Regarding Any Decision by MLB to Exclude All Post-2001 Bonuses*

141.    Neither the Initial Determination nor the Appeal Decision identified any internal record of a decision by MLB, the Commissioner, or the Pension Committee to exclude all bonuses received after 2001 from the computation of Participants' Supplemental Benefit.

142.    Neither MLB nor the Pension Committee seems to have any knowledge of when such alleged decision was actually made other than to surmise that it was at some time in 2002.

143.    Further, neither MLB nor the Pension Committee has identified the person or persons who allegedly made such a decision on behalf of MLB.

144.    Remarkably, the only documentary support that MLB or the Pension Committee offer is a single sentence that was included in the 2003 Mariner Memo that read "[o]ne-time bonus payments are typically not included".

145.    It defies logic that MLB would not have pursued an appropriate amendment to the SUPP to provide for the exclusion of all such bonuses and would instead have intended to effect such exclusion through individual annual notices to all Participants.

146.    The absence of any documentary evidence clearly reflecting such alleged decision stands in stark contrast to the clear documentation of other changes to the SUPP over the years through formal amendments.   Indeed, Major League Baseball properly amended the SUPP multiple times during Tully's employ through amendments which were appropriately memorialized.

147.    Effective January 1, 2004, Major League Baseball amended the SUPP (as so amended, the "2004 SUPP") to provide that a Participant's benefit would not be vested and payable until the occurrence of certain specific events.   Notably, this amendment ended annual SUPP distributions and essentially superseded the Qualified Notices of those SUPP Participants who had

previously elected for them.  It also amended Article 5.1 to provide that the Commissioner of Major League Baseball shall have the sole authority to amend the SUPP.

148.    As another example of MLB following the formal amendment procedure to the SUPP, the 2004 SUPP was amended effective December 31, 2008 to comply with Section 409A of the Internal Revenue Code of 1986 and to add Section 5.10.  At the same time, it amended Section 1.19 to update the list of participating employers.

149.    On December 9, 2009, the OEP was amended effective January 1, 2009 to expressly exclude the category of severance payments from the "Earnings" definition, with such amendment impacting the calculation of benefits for purposes of both the OEP and SUPP plans. ("Notwithstanding the foregoing, Earnings shall not include any severance payments or compensation paid in lieu of severance from employment.").

150.    In yet another showing that MLB knew how to formally amend the SUPP, two years later, effective December 31, 2010, Major League Baseball amended Section 1.11 of the 2004 SUPP to modify the calculation of the Gross Benefit of Participants over the age of 65. *See* Second Amendment to the Major League Baseball Supplemental Pension Plan for Office Employees, dated December 20, 2010.

151.    Major League Baseball then adopted another amended and restated SUPP in 2014 (the "2014 SUPP").

152.    Effective April 1, 2017, Major League Baseball amended the 2014 SUPP to memorialize the designation of a new Supplemental Plan Employer in a Schedule to the SUPP and confirmed that "[a]ll provisions of the SUPP not herein amended shall remain in full force and effect.".

153.    By amendment dated May 24, 2017, MLB amended the OEP to change the interest rate benchmark for the calculation of benefits, with such change impacting the calculation of benefits earned under both the OEP and SUPP Plans "on and after April 1, 2017".  Importantly, such amendment imposed irrevocable terms with respect to the methodology for calculating such benefits and did not afford any discretion to a plan employer to modify such terms—presumably to ensure compliance with the requirements of IRC § 409A.

154.    While the SUPP was amended, or amended and restated, numerous times during Tully's participation, no amendment to the SUPP ever authorized employers to exclude bonuses from the Supplemental Benefit calculation.

155.    Likewise, no amendment authorized a change that contravened or superseded Tully's Designation Notice, which expressly granted Tully "Full" "Pay Restoration for Office Plan Benefit" as his Supplemental Benefit.

156.    And no amendment memorialized the change to the Supplemental Benefit calculation that Defendants contend was announced by the 2003 Mariner Memo.

157.    In any event, if MLB had actually made a decision in 2002 to cease including bonuses in the Supplemental Benefit calculation for plan year 2002, that decision would have effectuated a reduction of benefits already accrued—an impact that could not be reasonably reconciled with the SUPP's express prohibition on even a formal amendment having such effect.

### *MLB Did Not Provide Notice to Tully of Any Alleged Decision to Exclude All Post-2001 Bonuses*

158.    The SUPP mandates that Gross Benefit and Supplemental Benefit of each Participant be determined solely pursuant to the SUPP and such Participant's designation notice.

159.    Since the SUPP expressly provides that it can only be amended in accordance with the terms of Section 5.1(a), the only documents that set forth the terms and conditions of the SUPP

for each Participant are the SUPP document itself, such Participant's designation notice, and any written amendment executed by the Commissioner subject to Section 5.1(a).

160.    The documents cited by the Pension Committee as allegedly notifying Tully of the exclusion of his bonuses stand in stark contrast to the clear notices that MLB provided to advise Participants of amendments to the SUPP.

161.    For example, by memo dated March 13, 2017, MLB notified SUPP Participants of the change to the interest rate benchmark used for the calculation of benefits and advised that such "change" would impact the calculation of "benefits earned on and after April 1, 2017" under both the OEP and the SUPP.  Notably, while the adverse impact of such change on Tully's SUPP benefit pales in comparison to the alleged exclusion of Tully's bonuses, MLB made certain to use clear language both in the amendment and the related notice to communicate the change.

162.    When MLB superseded Participants' Qualified Notices and ended annual benefit distributions, it formally amended the SUPP.  It then issued a full-page memo announcing the changes, explaining their purpose, and discussing the implications for plan Participants.

163.    To support the finding that MLB notified Tully of its alleged decision to exclude bonuses, the Initial Determination and the Appeal Decision did not cite to documents akin to what was provided in 2017.  Instead, these determinations cite to the 2003 Mariner Memo, the 2004 Manfred Memo, and a memorandum from Jonathan Mariner dated December 31, 2004 concerning "SERP Illustration of Deferred Payments at Vesting Date" (the "2004 Mariner Memo"), which included an attachment illustrating Tully's projected lump-sum SUPP benefit.

164.    These documents were not amendments executed by the Commissioner and therefore could not amend the SUPP's clear mandate that bonuses be taken into account during

the benefit calculation. These extraneous documents could not override the unambiguous terms of the SUPP.

165.    The Pension Committee has not identified any document provided to Tully  that makes any reference to: (i) any "decision" by the Commissioner, MLB, or the Pension Committee to exclude "bonuses" from the computation of SUPP benefits; (ii) any "change" of prior practice concerning the computation of SUPP benefits that had been applied uniformly for years; (iii) any differing treatment for bonuses received in 2001 or prior years as opposed to bonuses received after 2001; (iv) any exclusion of either Tully's bonuses specifically or *all* bonuses for *all* Participants; or (v) any basis for reconciling such decision with the SUPP's continuing mandate that bonuses be taken into account.

166.    The 2003 Mariner Memo could not provide proper notice of a change to the calculation of the Supplemental Benefit for the 2002 plan year since the 2002 plan year had already ended and Tully had already accrued the Supplemental Benefit for that year.

167.    The 2003 Mariner Memo showed that, consistent with all of Tully's prior annual distributions, MLB had calculated Tully's full Supplemental Benefit in accordance with the express terms of the SUPP and Tully's Designation Notice.

168.    The Pension Committee's reasoning implies that MLB purportedly revised the Supplemental Benefit calculation to supersede Participants' designation notices by excising a major category of compensation expressly included under the OEP, without executing an amendment to the SUPP.  It also means that MLB's only purported notice to plan Participants was a passing sentence in a routine annual memo, issued over a year after the change is alleged to have taken effect – "One-time bonus payments are typically not included."  That sentence neither acknowledged the occurrence of a change to the plan nor provided sufficient information to allow

Participants to understand the impact of that change on their Supplemental Benefit. Further, it offered absolutely no indication that it applied to Tully's "Full" "Pay Restoration for Office Plan Benefit."

169.    For its part, the 2004 Mariner Memo was not a summary of an actual plan distribution but merely an "Illustration of Deferred Payments at Vesting Date." (Under this formulation of the SUPP, Tully's vesting date would not occur until his retirement many years hence.)

170.    The 2004 Mariner Memo summarized the amendments to the OEP and SUPP that were discussed in the 2004 Manfred Memo eleven months earlier as resulting in "a more favorable plan" that protected "all" of Tully's OEP and SUPP benefits.

171.    In so doing, the 2004 Mariner Memo underscored that "all" of Tully's SUPP benefit would be preserved, either by shifting all or some portion of it to the OEP, and it reminded Tully of the two important conditions arising from the amendments: (1) the risk of forfeiture if he voluntarily left prior to retirement; and (2) the fact that he must wait until the occurrence of a triggering event, such as retirement, to receive his Supplemental Benefit.

172.    The 2004 Mariner Memo attached a complex, multi-part benefit calculation similar to the calculation attached to the 2003 Mariner Memo—although the calculation in the 2003 Mariner Memo concerned a benefit immediately payable whereas the 2004 Mariner Memo concerned a projected benefit payable upon Tully's retirement some two decades later.

173.    The 2004 Mariner Memo parroted language used in the 2003 Mariner Memo, including the warning that the benefit calculation was "complicated" and the disclaimer that the W-2 earnings listed in the attached calculation did not match Tully's actual W-2s.

174.    It also repeated the language used in the 2003 Mariner Memo concerning "Part D" of the SUPP benefit calculation, stating Part D reflects the difference between Tully's benefit under the OEP and the SUPP.  ("This payment is the difference between what will be paid to you upon termination or retirement from the qualified plan [OEP] and the total amount due to you if *all your compensation* was pensionable.")  (emphasis added).

175.    Thus, as with the prior memos, nothing in the 2004 Mariner Memo advised Tully that his signed Designation Notice was being superseded, that his annual bonuses received after 2001 would forever be excluded from his Earnings for purposes of determining his Supplemental Benefit, or that his future lump-sum Supplemental Benefit was being materially reduced by virtue of a change MLB unilaterally imposed to the calculation of Tully's Supplemental Benefit for plan years 2002 and beyond.

176.    Thereafter, Tully continued to receive annual statements from MLB relating to his projected benefits under the OEP and SUPP.  MLB provided two statements each year: (1) a statement of SUPP benefits generally issued each December or January (the "SUPP Statements"), and (2) a combined summary of benefits under the OEP and SUPP generally issued each June (the "OEP-SUPP Combined Statements").  Neither set of statements conveyed any material change to the calculation of Tully's Supplemental Benefit.

177.    Moreover, upon information and belief, the SUPP Statements ceased including the phrase "one-time bonus payments are typically not included" after 2005.

178.    The SUPP Statements advised Participants that the calculations were illustrative and based on a number of variables.

179.    The OEP-SUPP Combined Statements expressly confirmed that the estimates they contained were not indicative of any change to the plan, and that "[a]ctual benefits will be paid in

accordance with the official plan documents and records." Recent OEP-SUPP Combined Statements also highlighted that "[a]ctual benefits will likely differ from the amounts shown above."

180.    In summary, all the documents MLB cites to are extraneous, irrelevant, and do not override the clear terms of the SUPP. In any event, MLB has failed to provide any evidence it even intended to change the calculation of Tully's Supplemental Benefit as of plan year 2002, and any purported notice of that alleged change failed to provide a reasonable basis for Tully to know either that the SUPP's computation methodology had been changed or how that change would impact him. The Pension Committee's interpretation of the SUPP as permitting such a change to Tully's Supplemental Benefit calculation without an amendment to the SUPP cannot survive *de novo* review and is also arbitrary and capricious. Such interpretation directly contradicts, and is prohibited by, the express terms of the SUPP and Tully's Designation Notice, suggests that the SUPP would fail to comply with IRC Sec. 409A and related regulations, and violates general rules of contract interpretation.

### *The SUPP Does Not Allow for the Exclusion of Tully's Bonuses*

181.    Section 1.12 references an "aggregate dollar limitation as may be imposed by the Supplemental Plan Employer in connection with the Participant's participation in the Supplemental Plan." But Section 1.12 must be read in the context of any limit imposed by Section 2.1, which states "the Supplemental Plan Employer shall specify in [the Designation Notice] whether any limit shall be imposed on the amount of compensation taken into account for purposes of determining such Key Employee's Supplemental Benefit." Section 2.1 is the only provision of the SUPP that authorizes an employer to impose a limit on the "amount of compensation taken into account for purposes of determining [the Supplemental Benefit]".

182.    The Pension Committee's interpretation of Section 1.12 to permit MLB to do at any time what Section 2.1 requires MLB to do *as of a certain time* improperly reads the clear and express conditions of Section 2.1 out of the SUPP.

183.    Neither Section 1.12 nor Section 2.1 authorizes an employer to exclude *types* of compensation from the Supplemental Benefit calculation.   Rather, those sections expressly authorize only an *"aggregate* dollar limitation" (SUPP § 1.12 (emphasis added)) *"*on the *amount* of compensation taken into account for purposes of determining such Key Employee's Supplemental Benefit."  (SUPP § 2.1) (emphasis added).

184.    The reasons the SUPP permits an employer to impose a limitation on the *amount* of compensation but not to exclude any *type* of compensation are obvious.

185.    *First*, the *types* of pensionable compensation are listed in the OEP's definition of Earnings, which expressly includes bonuses, and thus could only be changed through a formal amendment of the plan by the Pension Committee (SUPP dated June 10, 1997 § 5.1(a)) or as per a later amendment, the Commissioner (SUPP §§ 5.1(a)).

186.    *Second*, the concept of an aggregate limitation on the amount of pensionable compensation is borrowed directly from IRC § 401, which imposes an aggregate limit on the amount of pensionable earnings for qualified plans.

187.    The SUPP was expressly created to pay a Key Employee a retirement benefit in excess of that limitation.  The ability to impose an aggregate dollar limitation on the amount of compensation to be included in the Supplemental Benefit calculation allows the employer to put a cap on the amount of the Supplemental Benefit payable in excess of the qualified plan benefit.

188.     Pursuant to Section 2.1, SUPP employers have imposed aggregate dollar limitations on the amount of compensation taken into account when calculating the Supplemental Benefit of certain other SUPP Participants.

189.     In fact, the 1997 version of the SUPP imposed a "compensation limit" on two Chicago White Sox employees prior to the commencement of their participation in the SUPP.

190.     While the SUPP makes it abundantly clear in Section 5.1 that not even an amendment of the plan by the Commissioner "shall adversely affect any benefits accrued by any Participant or former Participant prior to the effective date of such amendment," the Committee interprets Section 1.12 to authorize a Supplemental Plan Employer to impose limitations on the benefits of Participants without any similar express prohibition or being subject to any express conditions whatsoever.

191.     Notably, the only provision of the SUPP that allows for any reduction of the amounts payable to a Participant is Section 5.9, which only authorizes the Pension Committee (not any Supplemental Plan Employer) to reduce amounts payable under the SUPP only "to avoid the duplication of benefits otherwise payable under [the SUPP] as a result of adjustments under Section 401(a)(17) of the Code or otherwise." (SUPP § 5.9). Obviously, if the SUPP reserved for a Supplemental Plan Employer the continuing right to subsequently impose, in its discretion, limitations on the amount of compensation taken into account, there would be no need to either expressly authorize the Pension Committee to address the issue or to restrict any subsequent reduction of benefits to only this limited circumstance.

192.     Section 1.12 does not alter the employer's rights and obligations under Section 2.1, nor does it grant or contemplate any authority by the employer to limit a participant's benefits other than through the mechanism and at the time provided in Section 2.1.

193.    The Pension Committee's interpretation of Section 1.12 is inconsistent with Section 409A's definition of "deferred compensation" which provides that Participants must have a legally-binding right to such compensation and that a legally-binding right does not exist if an employer retains unfettered discretion to reduce or eliminate compensation (or to exclude a type of compensation).  26 CFR 1.409A-1(b).  Given that the Plan is clearly intended to comply with Section 409A (SUPP § 5.10; *see also* SUPP § 5.7), it is unreasonable for the Pension Committee to interpret plan compensation in a way that is inconsistent with the definition of deferred compensation under 26 CFR 1.409A-1(b), and contrary to SUPP § 5.10 which requires that "all provisions of the SUPP shall be construed and interpreted to comply with Code section 409A."

194.    The Pension Committee's interpretation of Section 1.12 of the SUPP to afford MLB continuous "broad discretionary authority" to impose such a limitation and/or exclusion "at any point" without any applicable express restrictions or conditions is unreasonable and would violate Section 409A's documentary requirements which provide that plan documents must include all material terms in writing, including the amounts deferred or, in the case of an amount determinable under an objective, nondiscretionary formula, the terms of such formula.   The Committee's positions that one-time bonus payments are "typically" excluded from earnings and that it has "broad discretionary authority" to impose such a limitation and/or exclusion "at any point" introduces a prohibited element of discretion to the SUPP's benefit formula and would constitute a violation under Section 409A, a result that the Committee could not have reasonably intended, and contrary to SUPP § 5.10 which requires that "all provisions of the SUPP shall be construed and interpreted to comply with Code section 409A."

***MLB Defaults on its Obligations Under Section 5.6 of the SUPP***

195.    Defendants agreed to pay Tully "all legal fees and expenses incurred by [Tully] in seeking to enforce any right or benefit provided to [Tully] under the Supplemental Plan, as when such expenses become due" when the parties entered into the SUPP.  (SUPP § 5.6).

196.    Tully hired counsel Rivkin Radler to enforce his benefits under the SUPP through the administrative process.

197.    MLB reimbursed Tully for Rivkin Radler's fees, incurred through August 2023.

198.    Defendants, by and through their counsel Morgan Lewis LLP, reiterated MLB's obligation to pay Tully's legal fees.

199.    In an email dated January 16, 2024 sent to Rakower Law PLLC, Tully's new counsel, MLB's counsel stated: "this e-mail will confirm that MLB [will] continue to pay Tully's attorneys' fees and expenses incurred to enforce any right or benefit provided under the Plan in accordance with Section 5.6 of the SUPP." *See* Ex. A.

200.    Tully agreed to execute a tolling agreement in reliance upon receipt of the January 16, 2024 email.

201.    Tully continued to rely on MLB's promise in the January 16, 2024 email when he hired Morrison Cohen LLP as counsel to represent him.

202.    In February 2024, MLB advised Morrison Cohen LLP of its new view that it is not obligated to pay the fees of former Participants (suggesting Tully is no longer a Participant) to enforce rights under the SUPP or to pay fees that it unilaterally deems to be unreasonable or duplicative.

203.    MLB now claims they have had no obligation to pay Tully's legal fees more than 61 days after his retirement, reasoning that he is no longer a "Participant" under the SUPP.

204.    MLB's position is contrary to both the clear terms of the SUPP and its actions since Tully's retirement at the end of 2022.

205.    The Pension Committee did not even issue the Appeal Decision until August 29, 2023- eight months after Tully's retirement.

206.    In October 2023, MLB reimbursed Tully in full for Rivkin Radler's fees incurred during the administrative process, which encompassed work done through August 2023.

207.    MLB has failed and refused to pay Mr. Tully's legal fees and expenses as reflected on the invoices of Rakower Law PLLC, Cohen & Buckmann, PC, and Morrison Cohen LLP that were forwarded on February 23, 2024.

208.    MLB's counsel confirmed to Morrison Cohen on March 6, 2024 that MLB will not pay Mr. Tully's legal fees and expenses in connection with this action.

209.    Morrison Cohen LLP notified MLB of its default under the SUPP via letter on Monday, March 11, 2024.

210.    MLB responded on March 13, 2024.

211.    MLB's continued refusal to pay Tully's legal fees and expenses constitutes a breach under the SUPP. Based upon such refusal and breach Mr. Tully hired his current counsel Kaiser Saurborn & Mair, P.C..

### The Pension Committee's Conflict of Interest and Bias Requires De Novo Review of the Denial of Benefits Claim

212.    The Pension Committee has a categorial conflict of interest as administrator of the Plan as per SUPP §§ 1.8 and 4.1 and also because of its important role regarding the designation and acknowledgement process under §§ 2.1 and 2.2.

213.    The Pension Committee is comprised of executives of the Supplemental Plan Employer, and the Supplemental Plan Employer is responsible for the payment of the SUPP

Benefit.  This cross over creates a categorical conflict of interest and led to a biased and conflicted denial of Tully's claim.

214.    Pursuant to SUPP § 2.1, the Supplemental Plan Employer was required to specify any limit to be imposed on the amount of compensation taken into account for purposes of determining a Key Employee's Supplemental Benefit.  The executed acknowledgement of the notice had to then be delivered to both the Supplemental Plan Employer and the Pension Committee.  Importantly, the effective date of the designation of a person as a Participant is "the first day of the calendar month following the date notice is provided to the [Pension] Committee." *Id.* at § 2.2.  The Supplemental Plan Employer never took these steps to exclude bonuses from Tully's retirement benefit.

215.    The Pension Committee, which shares Supplemental Plan Employer executives, was thus aware that Tully did not execute an acknowledgement that would support excluding Tully's bonuses.

216.    SUPP § 5.1 required any amendment by the Commissioner to be delivered to all participating Supplemental Plan Employers and to the Pension Committee, which both the Supplemental Plan Employer and the Pension Committee well knew had not occurred.

217.    Despite these conflicts, or perhaps because of them, the Pension Committee sided with the Supplemental Plan Employer's interpretation, even though it also determined that the only document cited by the Supplemental Plan Employer, the 2003 Mariner Memo, was irrelevant to Tully's claim.

218.    The Pension Committee also elected to rely on extraneous documents not cited by either party to support its conclusion and disregarded the operative documents which fully described Tully's benefit.

219.     Tully presented evidence of these conflicts as well as the Pension Committee's refusal to fully respond to Tully's document and information requests.

220.     The Pension Committee's Appeal Decision:

    a.     disregarded the unambiguous terms of the SUPP;

    b.     relied on extraneous documents rather than the clear and express language of the SUPP for the basis of its decision;

    c.     rewrote key provisions of the SUPP to reach its conclusion;

    d.     rejected the 2003 Mariner Memo although that was the only document cited by MLB as a basis for its determination;

    e.     ignored that the Initial Determination disregarded the 1998 Designation Notice;

    f.     was at odds with the Initial Determination's assertion that MLB, as Tully's Supplemental Plan Employer, had determined to exclude "discretionary bonuses" paid to him for purposes of the calculation of his Supplemental Benefit by stating in its Appeal Decision that MLB had determined to exclude all bonuses received after 2001 for purposes of calculating the Supplemental Benefits of all Participants;

    g.     disregarded that Tully's prior SUPP payments took bonuses into account;

    h.     disregarded that MLB never identified any other document that purported to serve as a Section 2.1 notice or suggested that the 1998 Designation Notice had been superseded; and

    i.     ignored that (i) at all relevant times, "bonuses" have been expressly included as "Earnings" under the OEP which also applies to the SUPP; and (ii) MLB never effected an amendment of the SUPP to address the treatment of bonuses.

221.     Defendants have not shown that they took sufficient steps to limit bias from infecting the administrative review process.

222.     These categorical and case-specific conflicts of interest should entitle Tully to *de novo* review or should at least be weighed as a factor in determining whether the denial of benefits was arbitrary and capricious.

***The Pension Committee's Failure to Comply with Document Requests Requires De Novo Review of the Denial of Benefits Claim***

223.    ERISA § 503(a)(2), 29 U.S.C. § 1133(a)(2) provides, "in accordance with regulations of the Secretary, every employee benefit plan shall . . . afford a reasonable opportunity to any Participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." ERISA § 503(a)(2), 29 U.S.C. § 1133(a)(2). Additionally, SUPP § 6.3 provides that "[a]fter receiving written notice of the denial of a claim, a claimant [] shall be entitled to (a) request a full and fair review of the denial of the claim by written application to the Committee".

224.    An ERISA plan's claims review procedure must "[p]rovide that a claimant shall be provided, upon request and free of charge . . . copies of, all documents, records, and other information relevant to the claimant's claim for benefits" and claim for benefits "on review." 29 C.F.R. § 2560.503-1(h)(iii) and § 2560.503-1(j)(3). Additionally, SUPP § 6.3 provides that "[a]fter receiving written notice of the denial of a claim, a claimant [] shall be entitled to . . . (b) request, free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claim".

225.    "Whether a document, record or other information is relevant to a claim for benefits shall be determined by reference to paragraph (m)(8) of this section." 29 C.F.R. § 52560.503-1(h)(2)(iii).

226.    Paragraph (m)(8) provides in pertinent part: "A document, record, or other information shall be considered "relevant" to a claimant's claim if such document, record, or other information: (i) Was relied upon in making the benefit determination; (ii) Was submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit

determination; (iii) Demonstrates compliance with the administrative processes and safeguards required pursuant to paragraph (b)(5) of this section in making the benefit determination." *Id.* § 52560.503-1(m)(8).

227.    The opportunity to review the documents, records and information relevant to a Participant's claim and claim on review is critical to a full and fair review, because only then can a claimant have access to the evidence upon which the decision-maker relied in denying the claim and thus the opportunity to challenge its accuracy and reliability.

228.    Review of the "relevant" documents, records and other information in this case will establish that Defendants' denials lacked any rational basis and were the product of conflicts of interest.

229.    Defendants' failure to produce relevant documents to Plaintiff constitutes a failure to comply with the claims-procedure regulations under ERISA and the SUPP.

230.    Defendants will not be able to meet their burden of showing that the violations were inadvertent and harmless.

231.    Accordingly, Plaintiff is entitled to *de novo* review.

***The Pension Committee's Denial of Tully's Claim is not only Contrary to the Clear Mandate of the SUPP, but is also Arbitrary and Capricious***

232.    The 2003 Mariner Memo was the only document MLB cited to justify the exclusion of Tully's bonuses from its calculation of the amount of his final Supplemental Benefit distribution.

233.    The Pension Committee then rejected this document because it related to a SUPP distribution that occurred before 2004.  It then grasped for other documents that MLB had not previously cited.

234.    The Appeal Decision contradicted the Initial Determination by asserting that the 2003 Mariner Memo reflected a decision to exclude *all* bonuses for *all* plan Participants— essentially interpreting "one-time bonus payments" to mean "all bonuses", and "typically" to mean "always."

235.    The Appeal Decision, like the Initial Determination, is clearly erroneous, cannot survive *de novo* review, and is also arbitrary and capricious.  Moreover, it lacks any reasonable basis in the SUPP and relies on extraneous documents to reach conclusions that directly contradict, and are prohibited by, the express terms of the SUPP and Tully's Designation Notice, that would suggest that the SUPP fails to comply with IRC Section 409A, and that violate general rules of contract interpretation.

***Tully Engages Counsel to Challenge the Denial of His Benefits Under the SUPP***

236.    Section 5.6 of the SUPP provides that Defendants will pay Tully "all legal fees and expenses incurred by [Tully] in seeking to enforce any right or benefit provided to [Tully] under the Supplemental Plan, as when such expenses become due."  (SUPP § 5.6).

237.    Tully hired counsel Rivkin Radler LLP ("Rivkin Radler") to assist him in enforcing his benefits under the SUPP.

238.    Defendants, by and through their counsel Morgan Lewis LLP ("Morgan Lewis"), originally agreed to pay Tully's legal fees in the present action.

239.    Indeed, Major League Baseball reimbursed Tully for Rivkin Radler's fees in the administrative process.

240.    When Tully hired new counsel, Rakower Law PLLC, Morgan Lewis confirmed in writing that MLB would "continue to pay Tully's attorney's fees and expenses in accordance with Section 5.6. of the SUPP."

241. However, in February 2024, MLB asserted to Mr. Tully's then counsel, Morrison Cohen LLP, that it is not obligated to pay the fees of former Participants (suggesting Tully is no longer a Participant) to enforce rights under the plan or to pay fees that it unilaterally deems to be unreasonable or duplicative.

242. If MLB were to refuse to pay Tully's legal fees, Defendants would be materially and substantially breaching SUPP § 5.6.

243. Based on all of the foregoing, Tully is entitled to payment of his full Supplemental Benefit, with interest, costs, and attorney's fees.

## CLAIMS FOR RELIEF

## COUNT I

**Violation of ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B)**
**Against Defendants Major League Baseball Supplemental Pension Plan For Office**
**Employees; Office of The Commissioner Of Baseball d/b/a Major League Baseball, it its**
**Capacity as Plaintiff's Employer; and Major League Baseball Pension Committee, in its**
**Capacity as the Administrator of the SUPP**
**(Recovery of Benefits Due Under the SUPP Against All Defendants)**

244. Plaintiff incorporates and re-alleges each of his previous allegations as though fully set forth herein.

245. The SUPP is subject to the enforcement provisions of ERISA.

246. Pursuant to ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), Tully, as a plan Participant, may bring this action to recover the benefits due to him under the terms of the SUPP.

247. At all relevant times, MLB was an employer and Supplemental Plan Employer under the SUPP.

248. At all relevant times, the Pension Committee was the administrator of the SUPP.

249. Under the SUPP, Tully is entitled to receive a Supplemental Benefit based upon Earnings, as defined in the OEP, which includes his bonuses.

250.    When Tully retired on December 31, 2022, he had fully earned his Supplemental Benefit.

251.    MLB does not dispute Tully's right to payment of his Supplemental Benefit and has, in fact, issued what it alleges to be a full payment of that benefit.

252.    Upon information and belief, both MLB and the Pension Committee approved the calculation of the payment to Tully before the payment was issued.

253.    However, the payment calculation wrongfully excluded Tully's bonuses, which constitutes a violation of the express and unambiguous terms of the OEP and the SUPP.

254.    The Pension Committee lacks an actual, good faith justification to allow MLB to make a payment of Tully's Supplemental Benefit that did not properly account for his bonuses. The Pension Committee's decision cannot survive *de novo* review and is also arbitrary and capricious.

255.    Under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), Defendants are liable to Tully, jointly and severally, for a sum equal to not less than $5,904,320, reflecting the difference between the amount due to Tully under the SUPP and the deficient payment.

256.    Tully respectfully requests an award against Defendants, jointly and severally, for this past-due sum, attorneys' fees and costs, and prejudgment interest under ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1).

### COUNT II (IN THE ALTERNATIVE TO COUNT I)

**Equitable Relief (Promissory Estoppel) under ERISA § 502(a)(3)**
**Against Defendants Major League Baseball Supplemental Pension Plan For Office**
**Employees; Office of The Commissioner Of Baseball d/b/a Major League Baseball, it its**
**Capacity as Plaintiff's Employer; and Major League Baseball Pension Committee, in its**
**Capacity as the Administrator of the SUPP**
**(Recovery of Benefits Due Under the SUPP Against All Defendants)**

257.    Plaintiff incorporates and re-alleges each of his previous allegations as though fully set forth herein.

258.    The SUPP is subject to the enforcement provisions of ERISA.

259.    At all relevant times, MLB was an employer and Supplemental Plan Employer under the SUPP.

260.    At all relevant times, the Pension Committee was the administrator of the SUPP.

261.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)(B), Tully, as a plan Participant, may bring a civil action to "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

262.    As an alternative to Count I, if MLB possessed the authority to exclude Tully's bonuses from the calculation of his Supplemental Benefit without amendment to the SUPP and without following the written designation notice and acknowledgement process, then Defendants should be estopped from exercising that authority here.

263.    The SUPP represented a promise to Tully that he would receive full pay restoration for his OEP benefit and that Tully's bonuses would be included in the calculation of his Supplemental Benefit, which Tully acknowledged by executing the Designation Notice.

264.    Tully relied on the SUPP's promises when he signed the Designation Notice, which reflected his knowledge and acceptance of his SUPP benefit.

265.    The memoranda and statements provided to Tully in connection with each Supplemental Benefit distribution for plan years 1999 to 2002 reflected the inclusion of his bonuses during each applicable 60-month period.

266.    The clear language of the 2003 Mariner Memo, the payment calculation attached to the memo, and the actual distribution made to Tully for plan year 2002 all confirmed that, consistent with all prior Supplemental Benefit calculations, Tully's bonuses were taken into account when determining his Supplemental Benefit for plan year 2002.

267.    No other document provided to Tully prior to his retirement provide any notice of MLB's purported change to the Supplemental Benefit calculation.

268.    The 2004 Manfred Memo informed Tully that his entire benefit was being protected through the amendment of the SUPP that resulted in "a more favorable plan for you."

269.    The 2004 Mariner Memo provided Tully with a statement of his benefit that "reflected the amendments" announced by the 2004 Manfred Memo earlier that year.

270.    Like the 2003 Mariner Memo, the 2004 Mariner Memo included the warning that the benefit calculation was "complicated" and the disclaimer that the W-2 earnings listed in the attached calculation did not match Tully's actual W-2s.

271.    Thereafter, MLB provided Tully with annual statements concerning his benefits under both the OEP and the SUPP.  The SUPP Statements advised Participants that the Supplemental Benefit calculation was complex and that the numbers provided in the statement were not sufficiently detailed to permit Participants to independently assess their accuracy.  The OEP-SUPP Combined Statements expressly disclaimed that they reflected any change to the plan documents, emphasizing that Tully's ultimate lump-sum benefit would be calculated and paid according to the plan documents, plan records, and federal law.

272.    None of these statements advised Tully that his signed Designation Notice was being superseded, that his annual bonuses received after 2001 would forever be excluded from his Earnings for purposes of determining his Supplemental Benefit, or that his future lump-sum

Supplemental Benefit would be materially reduced by virtue of a change MLB unilaterally imposed in 2002 to the methodology it utilized to calculate Tully's Supplemental Benefit.

273.    The Pension Committee has failed to identify any document that makes any reference to: (i) any formal decision by the Commissioner, MLB, or the Pension Committee to exclude bonuses from the computation of SUPP benefits; (ii) any change of prior practice concerning the computation of SUPP benefits that had been applied uniformly for years; (iii) any differing treatment for bonuses received in 2001 or prior years as opposed to bonuses received after 2001; (iv) any exclusion of either Tully's bonuses specifically or *all* bonuses for *all* Participants; or (v) any basis for reconciling such decision with the SUPP's continuing mandate that bonuses be taken into account.

274.    As to the first element of promissory estoppel, Tully relied on the promises contained in the following documents;  (i) the SUPP; (ii) the Designation Notice, (iii) each prior Supplemental Benefit distribution Tully received (i.e., for plan years 1999, 2000, 2001, 2002, and (upon information and belief) 2003), which was based on all his Earnings (as defined by the OEP), including his bonuses, for each applicable 60-month period, and (iv) the memoranda and statements provided to Tully in connection with each prior Supplemental Benefit distribution he received (i.e., for plan years 1999, 2000, 2001 and 2002), which reflected the inclusion of his bonuses during each applicable 60-month period.

275.    Tully relied on the fact that the SUPP does not allow for modification of the methodology for calculating Tully's benefit absent an amendment applicable to all Participants. *See* SUPP § 5.1 ("Any such amendment shall be by an instrument in writing executed by the Commissioner and delivered to all participating Supplemental Plan Employers and to the Committee.")

276.    Tully relied on the SUPP's promises when he signed the Designation Notice in 1998, which reflected his knowledge and acceptance of his SUPP benefit.  Tully also relied on the Supplemental Benefit distribution he received for plan years 1999, 2000, 2001, and 2002, and (upon information and belief) 2003, which was based on all his Earnings (as defined by the OEP), including his bonuses, for each applicable 60-month period, as well as the memoranda and statements provided to Tully in connection with each Supplemental Benefit distribution for plan years 1999 to 2002, which reflected the inclusion of his bonuses during each applicable 60-month period.

277.    Indeed, as a result of his reliance on these clear and unambiguous promises, Tully worked for MLB for 30 years until he retired in 2022.

278.    Tully has been injured by Defendants' inducements to sign the Designation Notice and remain at MLB for 30 years only to subsequently be deprived of millions of dollars in a retirement benefit.

279.    An injustice will occur if the Defendants' promise in the SUPP is not enforced.  If Defendants succeed in depriving Tully of his benefits, notwithstanding Defendants' previous assurances that Tully's bonuses would be taken into account when calculating his benefit, which were reflected in the Supplemental Benefit distribution Tully received for plan years 1999, 2000, 2001, 2002, and (upon information and belief) 2003, then Tully will be deprived of $5,904,320 he earned over the last 20 years of his career and Defendants will achieve a windfall.

280.    Extraordinary circumstances exist here.   Upon information and belief, after agreeing to provide Tully the retirement benefit clearly set forth in the SUPP and inducing him to remain at MLB for the entirety of his career, Defendants covertly determined at some point to

withhold a significant percentage of Tully's SUPP benefits and to deprive him of his hard-earned retirement benefit.

281.    MLB: (a) failed to memorialize in writing any aggregate dollar limitation; (b) failed to document any amendments that would result in a multimillion dollar decrease in Tully's retirement benefits; (c) failed to offer a reasonable or even consistent basis for the denial of his full retirement benefit during the administrative process; and (d) withheld a significant percentage of Tully's SUPP benefit despite MLB's confirmation that the restructuring of the SUPP on which it now relies would actually "result in a more favorable plan for [Participants]."

282.    MLB consistently confirmed that Tully's SUPP benefit would be "paid in accordance with the official plan documents and records."

283.    The last SUPP amendment stated that "all provisions of the SUPP not herein amended shall remain in full force and effect."

284.    The rapidly escalating accrual of benefits based on Tully's increases in compensation and his approach to retirement age served as material inducements for Tully to remain at MLB until his retirement.

285.    MLB benefitted from Tully's dedication and excellence, including from Tully's role in securing billions of dollars in local, national, and international rights fees for MLB and from his role in the launch of MLB Network.

286.    Defendants' misrepresentations of the SUPP's terms have intentionally or foreseeably induced Tully to continue his career at MLB in anticipation of being paid out a Supplemental Benefit that would be calculated based upon all of his Earnings (including his bonuses). Tully's action of continued employment and forbearance from pursuing other career opportunities represents the extraordinary circumstance that satisfies the estoppel claim.

287.    In fairness and good conscience, Defendants must be estopped from enabling MLB to renege on its promises to Tully's detriment.

288.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Defendants, jointly and severally, must pay Tully the unpaid portion of the full amount of his Supplemental Benefit, which is a sum equal to not less than $5,904,320.

289.    Tully respectfully requests an award against Defendants, jointly and severally, for the unpaid portion of his Supplemental Benefit, attorneys' fees and costs, and prejudgment interest under ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1).

## COUNT III

**Breach of Contract Against Defendants**
**Major League Baseball Supplemental Pension Plan For Office Employees; Office of The Commissioner Of Baseball d/b/a Major League Baseball, it its Capacity as Plaintiff's Employer; and Major League Baseball Pension Committee, in its Capacity as the Administrator of the SUPP**
**(Recovery of Attorneys' Fees Due Pursuant to SUPP § 5.6 Against All Defendants)**

290.    Plaintiff incorporates and re-alleges each of his previous allegations as though fully set forth herein.

291.    Defendants agreed to pay Tully "all legal fees and expenses incurred by the [Tully] in seeking to enforce any right or benefit provided to the [Tully] under the Supplemental Plan, as when such expenses become due." (SUPP § 5.6).

292.    Defendants, by and through their counsel Morgan Lewis LLP, confirmed this obligation by email dated January 16, 2024, which stated "this e-mail will confirm that MLB [will] continue to pay Tully's attorneys' fees and expenses incurred to enforce any right or benefit provided under the Plan in accordance with Section 5.6 of the SUPP." *See* Ex. A.

293.    Mr. Tully signed the tolling agreement upon receipt of this confirmatory email and the promise to pay his fees.

294.    MLB has now changed its position and disclaims any obligation to pay Tully's legal fees.

295.    MLB is required to pay Tully's attorneys' fees and expenses during the pendency of this action. (SUPP § 5.6).

296.    MLB's failure and refusal to pay Tully's legal fees, constitute a material breach of the SUPP.

297.    As a result of Defendants' breach, Plaintiff has sustained damages flowing directly from Defendants' breach.  These include, but are not limited to, attorneys fees incurred by Plaintiff in seeking to enforce his rights under the SUPP, pursuant to SUPP § 5.6.

298.    The consequential damages were foreseeable and within the contemplation of the parties before or at the time the contract was made.

299.    On the Third Cause of Action for attorneys' fees pursuant to breach of contract, Plaintiff respectfully requests that the Court issue an Order declaring attorneys' fees, costs, and interest due to Plaintiff be paid in accordance with the contract, and such other and further relief as the Court deems just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands a judgment against the Defendants, jointly and severally:

(a)    With respect to Counts I and II, awarding Tully the difference between the Supplemental Benefit due under the SUPP following his retirement and the lump-sum paid to him on January 17, 2023, which is a sum equal to not less than $5,904,320, and awarding attorneys' fees and costs pursuant to ERISA §502(g)(1), 29 U.S.C.§1132(g)(1);

(b)    With respect to Count III, awarding attorneys' fees and costs pursuant to the SUPP;

51

(c)     Awarding all applicable prejudgment interest; and

(d)     Awarding such other relief as to this Court may seem just and proper, including,

but not limited to, punitive damages.

Dated:  New York, New York
        April 11, 2024

                        **KAISER SAURBORN & MAIR, P.C.**


                        By:_____
                             Daniel J. Kaiser, Esq.
                             William H. Kaiser, Esq.

                             Attorneys for plaintiff
                             30 Broad Street, 37th Floor
                             New York, New York 10004
                             (212) 338-9100